If it pleases the court, it's a pleasure to be before this court and this panel this morning. There are two issues before the court that are raised by this appeal. The first is whether claims arising under Section 256 of the Patent Act are subject to arbitration. In light of the underlying purpose of that statute, and whether in light of that purpose, it could be said that Congress did not intend that there be a waiver of judicial remedies. The second issue that's before the court is the question of whether the district court properly compelled arbitration in this case based on what it described as a theory of assumption. Could it do that in light of the District of Columbia Circuit ruling in DSMC? And could it do that in light of the relevant case law regarding assumption in the context of arbitration? So those are the two issues. May I encourage you, if it doesn't disrupt the plan, to start with the second issue? Because it may be a bit more complex, and at least I, for one, understand the issue. Very good, Judge. I had thought that perhaps 256 would more capture the imagination of the court, and I was going to start with that. But I'd be happy to move first to the question about the non-signatory. As this court is aware, under its ruling in Qualcomm, it is obliged, in the context of this motion to compel, to apply the law of the circuit from which the appeal emanated, in this case the D.C. Circuit. And as both parties have acknowledged, there is a D.C. Circuit case that is very important to whether the judge's actions here were proper. We say that that case is absolutely binding, and that case is DSMC. And the court will recall that in that case, although the case arose specifically under Section 16 of the Federal Arbitration Act that deals with interlocutory appeals, the court said it had to construe Section 4 in Chapter 1 of the Federal Arbitration Act, which is the means by which a petitioner can bring a motion to compel arbitration. Tell me why the equitable estoppel that the case you just cited deals with isn't entirely different than the assumption prong that this case the district judge went off on. Aren't they apples and oranges? I think they are apples and oranges, Judge. And if you look at the case law, especially the case law in the Second and Fifth Circuits, which I think is very instructive, there is a distinction about the claims and theories that a signatory can use to compel arbitration versus the claims that a non-signatory can use. Well, I think that issue, the one you just mentioned, is really the issue we have to confront, not equitable estoppel. The district court following DSMC felt bound not to go down that path and then looked at the assumption issue. Yes, Judge, that's right. Are you aware of any case, because I couldn't find any, any case where a willing non-signatory could compel arbitration by a non-willing signatory on an assumption theory? No, I'm not. And I think that's exactly the point. When the assumption doctrine is applied, it's applied by a signatory against a non-signatory. And if you look at the cases that we've marshaled in our brief and the one case that the court relied upon, which I'll call United Airlines because I can't pronounce the other name, in that case it was the signatory who had participated in an arbitration process with a non-signatory. There had been an award in all those cases. And in the context of a motion to vacate, the non-signatory then says, wait a minute, I'm not bound because you never had authority over me because I'm a non-signatory. You're talking about strangers to the situation. Isn't an important aspect the relationship between the signatory and the non-signatory? Otherwise, any arbitration agreement could be negated just by transferring the assets at issue to a subsidiary. Yes, Judge, that's quite right. The cases that look at the alternative equitable estoppel theory and the equitable estoppel theory to some degree. Isn't it a matter of equity? I'm sorry, Judge. It's a matter of equity. We're talking about the legal relationship. Yes, that's correct, Judge. And that's exactly what was at issue in the DSMC case, and that's why I think the case is relevant. In that case, we had two signatories to a contract that the court recalls. We had NGTV and we had DSMC. They had a confidentiality agreement, very much like the situation we had here. What happened is that NGTV, which is the National Geographic television outfit, took the database, a video or digital database that DSMC had created, and it gave that to a competitor of DSMC named Convera because it was dissatisfied with the counterparty's performance under the contract. That, according to DSMC, violated the confidentiality provision of the contract, and it started arbitration under the arbitration clause. It then also started a misappropriation claim against the competitor that had received this information. There is a giant difference between a misappropriation to a competitor and simply the action of a wholly owned entity of the original receipt of the information. That's true, Judge. It could be distinguishable on those grounds. But what I think is important about- That's critical, is it not, as to these relationships? But I think what's important, with Your Honor's permission, in the DSMC case, is the DSMC case said what would be relevant in an equitable estoppel theory is just that, the intertwinedness of the claims between the non-signatory and the signatory, the relationships. And the court said those are complex factual findings that would have to be made. But what the court says in DSMC is that we're not going to make those findings, we're not going to enter into that because those theories are theories that don't turn on signatories to a contract. Because Convera is not a signatory to a contract, we won't enter into those discussions. And in that case, I think what the Second Circuit and Fifth Circuit would say is that the non-signatory was asserting an alternative equitable estoppel theory. And that theory, as I think that the appellee points out correctly in its papers, looks at the relationship between the claims and parties and looks at the question of whether the claims being asserted by the signatory are based on the contract. Well, I think it's not helping if you don't really confront what I think is a very important aspect, and that is that we're dealing with a corporation and its wholly owned subsidiary, which is quite different from a contracting party. Well, I think in that case, there might have been other theories that were open to the court. There might have been a theory of alter ego. I mean, that's something that the Thompson CFS Second Circuit case talks about. They say there are five different ways, although in reality, those are ways in which a signatory compels a non-signatory. But for purposes of argument, perhaps the court could have said, well, yes, there's an identity between these parties, although, Judge, I don't necessarily think on policy grounds that would be the way to go. But that's not what the judge did here. In fact, I think this is very important, Your Honor, is that the judge in this case adopted a theory that was very sweeping, far more sweeping than the alternative equitable estoppel theory that DSMC did not allow, because all it requires is that the non-signatory raise its hand and say, yes, I will be bound, and then take some action toward being bound, and unilaterally, it attaches itself to an agreement. It's almost like it treats the arbitration clause as an open option to all comers. All you have to do is accept, and unilaterally, you can become bound to that contract. Parties, yes, there are affiliate structures. That's quite true, Judge. But we know that there are some structures with 200, 300, 400 affiliates, and we know that those corporate groups decide that specific affiliates will bargain with each other, and they do that for questions of risk, for questions of function, for business purposes. Are they now to be compelled to arbitrate because an affiliate on the other side, which is not a signatory, simply raises its hand? No, we're not deciding that case, except for the facts in this case. But I think those are similar to the facts in this case, Judge, because I think that if the court here countenanced the rule that was applied by the district court, it would be opening the door to a wide abuse of the arbitration process that really goes to the heart of the consensual nature of arbitration, because these affiliates could unilaterally bind themselves to the arbitration clause. Is something wrong, contrary to policy, to consenting to arbitration? Not unilaterally, Judge, because consent is supposed to be bilateral. It's supposed to be mutual consent. And the judge here said, in his opinion- Well, INVISTA agreed to the arbitration, and there's no argument that the corporate entities, which are now being addressed here, are not that somehow the confidentiality contract is void as a result of the transfer. There's no argument as to that. No, sir. So INVISTA was a party to the original confidentiality agreement and agreed to arbitration. Isn't that correct? Yes, INVISTA, N.A., initiated an arbitration under the confidentiality- Didn't say anything to the contrary when the transfer occurred between Rome-Polanc and then became Rodinall, and only because they have opted into this arbitration agreement and I just don't understand the argument that you're making now, that this signatory, non-signatory argument, when, as a signatory, you have the authority to bind Rodinall if you wanted to, correct? Judge, Rodinall is definitely a party. The two parties are INVISTA, N.A., and Rodinall. Those are the parties to the confidentiality agreement. The question is, is Rodinall PI status? And Rodinall PI is an affiliate of Rodinall. Then tell me, again, why we shouldn't be just looking at the issue of assumption and if there is anything more than Rodinall could have done to assume this confidentiality agreement and agree to arbitration. Tell me what that was as well. I think we have to start, Judge, by looking at the doctrine of assumption. I think the court created sort of a hybrid theory or yet another theory of assumption. It relies on the cases that apply assumption, which I call waiver of trial right cases, where a non-signatory has participated in entire arbitration in the context of a motion to vacate, then says we shouldn't be bound because you never had authority over us. Now, that obviously is an opposite to the situation we have here, but that's the case the judge invokes, and that line of cases is discussed in our brief. The judge also talks about assumption as if a party could unilaterally attach itself to the arbitration agreement. If you look at the joint appendix on pages 10 and 11, this is of the Learned District Court's opinion, it focuses on the fact that a PI wrote a letter, it then reiterated a statement, and then it goes on to say it asserts that this is an exchange of written communication sufficient to bind the parties. But in reality, what had been proposed is that INVISTA said we may be willing to arbitrate with you, and there was a written draft agreement that was exchanged, various versions of it between the parties, and this particular one's at pages 395 and 396 of the joint appendix, and it was never signed. And what we're saying is that this really isn't assumption. This is a question of whether the parties have now mutually agreed to arbitrate something that they're not required to arbitrate. Well, there was some writing between the parties, and there was some agreement to arbitrate with some conditions. The district court placed a lot of emphasis on it. Well, the district court placed emphasis on it in its opinion primarily as a unilateral expression of intent to be bound. It said that by these writings on behalf of the non-signatory, it has indicated it will be bound, and it's indicated that to the parties and to the court. What I don't think the court did was to say there was offer and acceptance, and we certainly have never said that we accepted or entered into an agreement. The agreement was never signed. We asked for certain conditions, and what we would say is that an agreement to arbitrate, if you're not already in a contract, is a contract like any other contract, and INVISTA N.A. had the right to extract certain conditions from Rodea P.I., it never was willing to give those conditions, and we never entered into the agreement. But you can't just say a party can just saddle up to an arbitration clause and wave its arms and say, I'm bound now, and suddenly the other party's disenfranchised of its judicial remedies and its litigation rights. And that's the sweeping impact, I think, that this decision would have, and I do think the court, with all respect, needs to look at the impact that such a decision would have by a federal circuit court. It would open the door to more tactical use by affiliates and other non-signatories of arbitration clauses to prevent, and in this case prevent, an owner of technology from exercising its lawful and appropriate litigation rights, and I think that's a very important issue here. And I would also say that that's exactly what DSMC does not allow. Judge, I have two minutes left, and I haven't addressed... How about saving that for rebuttal, and let's hear from the other side. Very good, Judge. Judge, I haven't addressed you on 256, though. May I do that? Let's see. It may be, depending on my colleagues, that we understand the issues of 256 more readily. Okay. We'll see. Good morning. May it please the Court, my name is John Greenblatt, representing Rodia P.I. If I can just emphasize a few points up front that I think have gotten lost, one is that Invista sued Rodia P.I., a French company, in the arbitration. They brought the arbitration against Rodia P.I., and Rodia P.I. accepted the invitation to be sued in the arbitration. This is before any letters or exchange or covenants were asked for. They sued. There was no objection to a jurisdiction by Rodia P.I. There hasn't been. They've been participating in the arbitration, which has been pending for, I think, two years, and proceeding. Invista didn't, before they did that, ask for representations and warranties and letters. They did it, and they must have had a good faith belief that Rodia P.I. was bound by the arbitration agreement, or they wouldn't have a basis to sue in arbitration against Rodia P.I. And they did have a reason to believe that Rodia P.I. would be bound under the circumstances, which I'll explain in a minute when I explain why I think that the record was clearly supported, the district court's conclusion on assumption. But that certainly might impact a theory of equitable estoppel, but the district court felt bound by its precedent and didn't go that way and decided instead on this assumption theory. How does the arbitration that was initiated by Invista against Rodia affect the assumption theory?  They commenced it, and Rodia P.I. assumed the duty to defend it and be bound by it by participating in the very arbitration that they commenced. That's number one. While it wasn't necessary to write letters making clear that we would be bound by the outcome and wouldn't argue to the contrary to either tribunal, for all purposes, having anything to do with both the substance of the agreement and the arbitration clause, we agreed to make clear to the court that we weren't going to try to wiggle out of it. It's precisely the opposite of what has been contended. We were trying not to use the corporate structure to avoid the outcome of the arbitration. There are confidentiality agreements between, to go to your question, Judge Newman, you have to look at the context and the relationship between parties here. Rodia Nill is a holding company, it has no employees. Rodia P.I. is a wholly owned subsidiary, it has employees. There were a number of confidentiality agreements, not just the one between Rodia Nill, but between various Rodia entities and Invista concerning precisely the same information in dispute here, the Gen 3 confidential communications. They all have arbitration clauses. All the various entities agreed to arbitrate with any disputes that would arise under that. They obviously thought that in pre-litigation correspondence between the parties, the correspondence was between, amongst others, Rodia P.I. and Invista, where they were talking about the dispute. It was no surprise when they sued in an arbitration. What was a surprise was that they also sued in federal court. And that's the question really that we think is here. They brought a case in federal court and in arbitration against Rodia P.I., where they alleged the same underlying facts, the same conduct. There's overlapping relief in claims, not identical, but overlapping. And the same fundamental question is raised in both proceedings, which is, did Rodia misappropriate the information that was provided pursuant to the confidentiality agreement and use it in patent applications? But if, in fact, their position is correct, that inventorship is something that can be decided only in federal court or administered, wasn't this a prudent step to take to assure that the critical issue somehow wasn't avoided, not deliberately, but by operation of the various laws? Your Honor, if the complaint were limited to the 256 claim, and if you assume the federal fact that you asked me to assume, which is that they're correct, that it can't be arbitrated, then the answer to that might be it would be prudent, although we would have argued that the case should certainly be stayed and await the outcome of the underlying factual predicates that are going to be determined in the arbitration, because the arbitration is highly likely to dictate the outcome and potentially lead to no need for judicial resolution going forward. Was this suggestion to the district court just to set aside any issues that the arbitrators may have thought they didn't have authority to decide? In the alternative, we moved for a stay. We moved to compel arbitration, dismiss the case, and compel arbitration, or in the alternative, stay the case and await the outcome of the pending arbitration to see if there was anything left. The court dismissed the case. But of course, we don't accept that 256 isn't arbitrable, but you asked me to assume that in answering your question. And the second point I wanted to make, Your Honor, is that they brought tort claims in addition to the 256 claim. I mean, it appears that they're no longer contesting that the tort claims, there's six claims that were brought in the district court. Four of them were tort claims. Only two of them were related to 256. They don't seem to be arguing that those aren't arbitrable under any particular act, that those claims aren't arbitrable. They overlap with the claims. They're asking for the same remedy, which is assignment of the patents. They're asking for damages as they are in the arbitration. And it's quite clear that they fall within the scope of the arbitration agreement, which is any claim arising out of the confidentiality agreement. So it was a much broader case. They've retreated to the 256 argument now. But the case that the district court was confronted with was an overlapping case that had one claim that they weren't bringing in the arbitration, in effect, which was the correction of the inventorship, which we've always contended will follow, in effect, the outcome of determining whether the information that's in the patent came from them, as they contend, or came from Did Rodea offer explicitly to implement an arbitrator's decision if, in fact, it's decided that this information was misappropriated? Or how? I'm sorry. I didn't understand. Did we offer to? I heard you say something about not to worry. If it turns out that the arbitrator decides in their favor, everything will come out right. Well, because we've said we'll be bound by the outcome of that arbitration. If the arbitrators order us, which they clearly can, to go with Invista to the director of the patent office and make an application, which can be done without any judicial interference. That's the way it's often done. We would, of course, comply with the order. We've said we'll be bound to the arbitration agreement and the outcome of the arbitration for all purposes. We have no intention of violating an arbitration order. They've brought us into the arbitration. We haven't objected. We've been participating for two years. We fully expect to comply if that's the outcome, if, in fact, that's what's ordered. And we would comply with that order. But the question is, should there be parallel cases? Given the arbitration is proceeding and will proceed, the arbitration has happened and is happening. The question is whether there should be parallel adjudications and parallel cases. And we contend under either the doctrine of equitable estoppel, which we don't agree the SMC has rejected at the initial level as opposed to on an interlocutory appeal, which it was determining very narrowly, that the question is whether or not under either equitable estoppel or assumption, given the facts and under the circumstances of this case, agreed to arbitrate this dispute. And we would submit that there were many facts in the record that supported the judge's determination below that we assumed the contract to arbitrate. If you look at the Thompson standard, what Thompson says is, in the absence of a signature, a party may be bound if its subsequent conduct indicates it's assuming the duty to arbitrate. That's the test. Did its subsequent conduct indicate that it assumed the duty to arbitrate? It's a course of conduct test. You look at the totality of the circumstances. What the district court looked at, the totality of the circumstances were, we say very clear. Invista first sued Rho-DAPI in an arbitration. Rho-DAPI accepted the invitation. It never objected. It hasn't objected. It has no intention of objecting to the jurisdiction of the arbitration. If you look at the statement of claim that they file in the arbitration, which is in its joint appendix 93-99, and you look at the paragraphs of what they're alleging against Rho-DAPI in that claim, it's Rho-DAPI. It's breach of the confidentiality agreement. They're alleging that the respondents, which includes Rho-DAPI, have violated their contractual obligations by including confidential information obtained by them pursuant to the confidentiality agreement in the patent applications. They say that we denied their contractual requests under section 3.2 of the confidentiality agreement to make an assignment. Those are contractual-based claims that they've made against Rho-DAPI. They have to have a good faith belief that under the circumstances of the case, Rho-DAPI was bound to the contract, which we've never denied for purposes of this dispute, having anything to do with this dispute. And if Rho-DAPI is bound to the contract, then they're bound to the arbitration clause. And Equitable Estoppel, this is a textbook case for Equitable Estoppel, because Equitable Estoppel says that the plaintiff can't rely on the contract affirmatively and then deny the arbitration clause, which is precisely what they're doing. And it wasn't surprising that INVISTA brought an arbitration because the pre-litigation correspondence between the parties made clear they were both talking about the dispute and treating one another as if they were parties to the dispute. As I mentioned, the context of this was that there were confidentiality agreements with numerous other Rho-DAPI affiliates dealing with the same subject matter, all of which had arbitration clauses. And as you were indicating, there's a very close relationship between Rho-DAPI and Rho-DNL. This is not an unwilling plaintiff here. This is not an unwilling signatory. This is a willing signatory. This signatory commenced an arbitration against Rho-DAPI, and there's no absolute rules. Judge Lynn, you're correct. We couldn't find a case either way. We couldn't find a case that said that a willing non-signatory can invoke the arbitration clause under an assumption theory. Or one that said it's not applicable. And the reason for that, and what we would suggest, is it's never an absolute rule. It's always a facts and circumstances test. The question is under the facts and circumstances with respect to the dispute before the court. If a third-party volunteer comes in and says, I want to assume the arbitration clause, well, under the facts and those circumstances, that may be inappropriate. And what Convera was trying to do in the DSMC case was they were competitors. They were trying to take advantage of an arbitration agreement in agreement with their mutual customer that they weren't a party to and use it to sue their competitor. And that's completely different even if the court was ruling that equitable estoppel didn't apply in the first instance, which it was because the DSMC court was very clear to limit its holding to the narrow question of whether or not under Rule 16 it had appellate jurisdiction. And I would just suggest on that if the court takes a look at the Tenth Circuit case, which is the Universal Services Fund case, the Tenth Circuit, which follows that holding, reads it precisely the same way. It says we're not saying equitable estoppel is not available at the lower court level. We're saying it doesn't provide the basis to appeal on an interlocutory basis as a matter of right, which is normally not afforded. And so we're going to interpret that narrowly. And now Justice Roberts made the same point. We're not ruling that equitable estoppel is inapplicable. On the arbitration initiated by INVISTA, it's not exactly parallel to the district court suit in the sense that the arbitration was initiated against Rodionil as well as Rodia PI. Correct. And so you have an arbitration there between signatories directly relating to the subject of the arbitration clause as well as Rodia PI. Correct. So it's not quite the same. It's not like INVISTA initiated an arbitration against PI, a non-signatory, and then filed a lawsuit in the district court. Well, it's not precisely the same. But as to Rodia PI, it is the same. And they talk about using the corporate structure to manipulate. The reason that the equitable estoppel doctrines and the other doctrines have arisen is so that people can't pick and choose affiliates they want to sue and say, otherwise you have to bind every affiliate in the corporate empire to an arbitration agreement, or you end up with parallel litigation. Well, but Mr. Beckett probably will argue that we arbitrated under the arbitration clause against the party that was the signatory. And because of the alleged breach of the confidentiality agreement and the subsequent events, this patent was issued to Rodia PI, and they're implicated. So we name them as well. That's what they're going to argue. I understand they're going to argue it, but there's no basis to name them Rodia PI in the suit. And they didn't limit it, by the way, to one claim or another claim. They sued Rodia PI for all of them in the arbitration agreement, in the notice of claim. But they have to have, there has to be a belief or doctrine that enables them to bring Rodia PI in. They brought them in because they had some belief Rodia PI was liable under the agreement. And that agreement is the agreement that has the confidentiality agreement, I mean, excuse me, the arbitration clause in it. And so by leaving Rodia Nil out, I mean, they might have argued that Rodia Nil was a necessary party for some reason in the US. They didn't. But they shouldn't be able to have parallel cases because they left out one defendant when they've, under the circumstances of this case, they've sued both of them in an arbitration. Any more questions? Thank you, Mr. Greenblatt. You're welcome. You can have your four rebuttal times. Thank you, Judge. Just to go back to the point that Mr. Greenblatt was talking about for a moment, I think the context here really is important. The confidentiality agreement between the two signatories, Invista NA and Rodia PI, had a provision. And it can be found at page 85 of the joint appendix. And what it said is that if Rodia Nil, I'm sorry, between Rodia Nil and Invista NA, if Rodia Nil takes this confidential information and wrongly uses it to get a patent, then that patent has to be assigned back to the technology owner, Invista. What Rodia Nil did, apparently, is to transfer that confidential information to an affiliate. Now, as Mr. Greenblatt said, there's a lot of affiliates on the Rodia side that have different confidentiality agreements. The one affiliate that happened not to have a confidentiality agreement was Rodia PI. So the reason that Invista NA initiated the arbitration against Rodia Nil and then added Rodia PI was because its contractual relief, the contractual relief of the assignment of the patent pack, would not have been effective if only Rodia Nil were the defendant. It needed to have the assignee as well. And that's the position that we've taken in front of the arbitral tribunal. We've said the reason that Rodia PI is in this at all is because for that contractual relief to be functional, they have to be at the table as well. So now we have a party, in our view, who has wrongly taken information under a confidentiality agreement, secretly given it to an affiliate that has no agreements with us, had that affiliate go and get a patent in the United States and other jurisdictions, and then when we attempt to use our judicial remedies against this affiliate that's been the misappropriator of our technology, it comes in and it invokes the arbitration clause of the confidentiality agreement to which it's not a party. So from our perspective, there are equities involved, but the equities involved run in our favor. The claims that we've made in the arbitration are contractual-based claims. The claims we've asserted in the lawsuit are tort claims and, most importantly, 256. And if I could just say a word on 256, I think that what this court has said in Chau is that standing under 256 is broad. The court has said that 256 needs to be broadly interpreted, and it has given standing not just to owners, but to people that can show a concrete financial interest. And it has said that a party can be made a defendant if it has some economic stake in the patent as well. And in addition to that, lower courts in the decisions that have actually been cited by the appellee talk about another type of right, which is the right to receive notice and be heard even if you don't have standing to make a claim. And what we say is that the purposes, the underlying purpose of 256 simply cannot be achieved in arbitration because it is procedurally a mechanism by which any number of people with standing can come into the proceeding. And some of the people who receive notice as concerned parties under 256 may ultimately have sufficient standing to become a party. We don't know that. And there are some of the courts that, and again in the lower court decisions, that say, well, we're not sure if this person is going to intervene as a party or not, but we recognize they have a statutory right to come and be heard and to give testimony. There is no way that that mechanism can be achieved in arbitration. Arbitration makes a virtue of secrecy. I mean, imagine how an inventor or a putative inventor, a claimed true inventor, is going to intervene in a confidential Swiss arbitration proceeding. It just can't happen. The mechanism that they propose is that somehow the court gives notice after the decision has been made in the context of enforcement proceedings. And what I would urge the court to do is to look at Article V of the New York Convention, which very strictly limits the grounds on which a district court can review a foreign arbitral award. There's no grounds to allow a party to come in and simply say, well, they got it wrong. We have to do it all over again. And that's true of domestic arbitrations as well under Section 10 of the first chapter of the Federal Arbitration Act. It's just unworkable, and it's not consistent with the congressional intent here. Okay. Thank you. Thank you, Mr. Beckett. Thank you, Mr. Greenberg. The case is taken under submission.